**Rasaq Dipo SALAAM, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 98–71439.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 2000

Filed Oct. 18, 2000

---

John W. Gehart, Los Angeles, California, for the petitioner.

Christine A. Bither (argued), Washington, D.C.; Loreto S. Geisse (briefed), United States Department of Justice, Office of Immigration, Washington, D.C., for the respondent.

Before: BROWNING, HALL, and SILVERMAN, Circuit Judges.

PER CURIAM:

Rasaq Dipo Salaam petitions for review of the decision of a divided Board of Immigration Appeals (BIA) denying his application for asylum and withholding of removal. We grant petition for review.

*I. Background*

The following information is drawn from Petitioner's application for asylum and testimony before the Immigration Judge (IJ). Rasaq Dipo Salaam, a 23–year–old Nigerian citizen, had been politically active in his home country since high school. In 1994, Salaam joined the Free Nigeria Movement (FNM), an organization whose mission is to fight government abuses. Less than one year after joining the organization, at age eighteen, Salaam became vice-president of the FNM chapter for his district of approximately 65 members. Salaam hand wrote "articles" or fliers criticizing the government and posted them around Lagos, Nigeria's capital. Each flier listed Salaam's name and address because he wanted people to send him information about further government abuses for inclusion in subsequent fliers. Salaam also organized demonstrations protesting government oppression. Salaam was the sole speaker at these meetings, which were intended to further disseminate the information contained in his fliers. Approximately 200–300 people attended the demonstrations, a count based on the number of fliers distributed.

The Nigerian police arrested Salaam four times. Each arrest followed circulation of one of Salaam's fliers attacking the government. The fliers criticized the government for such abuses as the execution of Ken Sara–Wiwa, a prominent opposition figure, the annulment of elections, the perpetration of random acts of violence against the population, and police corruption. After each arrest, Salaam was held incommunicado for several days and tortured by flogging. Salaam bears scars from these beatings near his right eye, on his right elbow, and on both knees. Despite these arrests, Salaam *continued to* circulate fliers critical of the government and to include his name and address.

The Nigerian police attempted to arrest Salaam a fifth time on March 7, 1997. When the armed officers arrived at his home, however, Salaam was out visiting a

friend. Hearing a radio inside, the officers broke down Salaam's door and ransacked his belongings. Salaam believes the police intended to arrest him as part of an effort to keep opposition leaders from disrupting up-coming elections. Fearing the police would again torture and perhaps kill him, Salaam slept in the streets for two weeks. He then fled to Ghana and eventually to the United States. He was able to gather only a few items of clothing and one textbook from among his scattered belongings before he fled.

After testifying to these events before the IJ, Salaam called two witnesses in support of his application for asylum. Olufemi Samuel, another young Nigerian political activist who was granted political asylum in the United States, met Salaam at a political meeting in 1988. Samuel was impressed by Salaam, a particularly vocal young activist, and predicted Salaam would someday "be something," perhaps Nigeria's president. After Samuel fled to the United States, he spoke to Salaam on the phone and encouraged Salaam to flee Nigeria as well. Salaam responded: "you guys are like people that ran away from the country when you should have been there, you know, a warrior and fight...." Salaam declared that he would die for his country.

Salaam's second witness was his older brother, Lekam Salaam, who testified that Petitioner has always been an aggressive and vocal person and that their mother worried about the danger to him because of his political activities.

In addition to these witnesses, Salaam submitted a State Department Profile of Asylum Claims and Country Conditions stating that the human rights situation in Nigeria "remains dismal" and opposition leaders are "at real risk," and another report confirming that "police and security services commonly committed extra-judicial killings and used excessive force to quell anti-government and pro-democracy protests." Finally, Salaam submitted documentary evidence that the FNM is "a grassroots based global mass movement working for the full and total restoration of freedom to Nigeria and its people."

The BIA conducted an independent review of Salaam's application. The BIA "disagree[d] with the Immigration Judge's finding of adverse credibility" but nonetheless concluded Salaam had not met his burden of proving eligibility for asylum because (1) aspects of his claim were "implausible" and (2) he failed to provide corroborating evidence. The Board found it "implausible" that Salaam was elected vice-president of the FNM when he was eighteen years old, and had been a member for less than a year. The Board found this aspect of Salaam's claim in conflict with information Salaam provided regarding the importance of the FNM. The Board also found it "unlikely" that Salaam was the sole spokesperson for the organization, and "implausible" that Salaam continued to put his name on his political writings after being arrested and beaten because of them. For these reasons, the BIA concluded Salaam "did not provide through his testimony a sufficiently detailed and believable account of the basis of his fear to meet his burden of proof solely on his testimony."

The BIA's second ground for denying Salaam asylum was that he failed to produce evidence to corroborate his claim or a reasonable explanation for his failure to do so. The BIA said various documents "should have been available" including evidence of Salaam's affiliation with the FNM, his medical records, and the fliers themselves. Salaam petitions for review. We have jurisdiction pursuant to 8 U.S.C. § 1252.

## II. Standard of Review

Because the BIA conducted a de novo review of Salaam's eligibility for asylum, we review the Board's decision. *See Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995). We review the factual findings underlying the BIA's decision, including its

**1238**

adverse credibility finding, under the substantial evidence test. *See Arteaga v. INS*, 836 F.2d 1227, 1228 (9th Cir.1988); *Lopez–Reyes v. INS*, 79 F.3d 908, 911 (9th Cir.1996).

### III. Analysis

#### A. Adverse Credibility Determination

■ Although the BIA rejected the IJ's adverse credibility determination, the BIA failed to make an explicit credibility finding of its own. The BIA simply commented on the "implausibility" of aspects of Salaam's testimony and concluded that Salaam had not met his burden of proving eligibility for asylum. Because a finding that testimony is "implausible" indicates disbelief, for the purposes of this appeal, we treat the BIA's comments regarding "implausibility" as an adverse credibility finding. *Cf. Abovian v. INS*, 219 F.3d 972, 978 (9th Cir.2000) (reviewing an adverse credibility finding that was based on the BIA's determination that the petitioner's testimony was "distracted, incoherent, and implausible"). As this Court has cautioned, however, the BIA should clearly address the issue of credibility whenever the IJ makes a finding that an applicant is not credible. *Cf. Cordon–Garcia v. INS*, 204 F.3d 985, 993 (9th Cir.2000) ("[W]e strongly encourage the BIA to discuss or expressly adopt, rather than ignore, the IJ's credibility findings in an asylum case.").

■ The BIA " 'must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief.' " *Osorio v. INS*, 99 F.3d 928, 931 (9th Cir. 1996) (quoting *Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir.1994)). Any such reason " 'must be substantial and bear a legitimate nexus to the finding.' " *Id.* (quoting *Mosa v. Rogers*, 89 F.3d 601, 604 (9th Cir.1996)). This Court reverses an adverse credibility determination that is based on "speculation and conjecture" and is not supported by evidence in the record.

*See Akinmade v. INS*, 196 F.3d 951, 957 (9th Cir.1999); *Lopez–Reyes*, 79 F.3d at 912 (holding that IJ's "astonishment" regarding aspects of petitioner's testimony was "conjecture" that could not "substitute for substantial evidence"); *Shah v. INS*, 220 F.3d 1062, 1071 (9th Cir.2000) (finding that the BIA's conclusion that it was "unbelievable" that the petitioner had so few pieces of correspondence after ten years of work for the opposition party rested on speculation and conjecture, and could not support an adverse credibility finding).

■ The BIA's adverse credibility finding is not supported by substantial evidence. The BIA's statement that it is "not plausible" that Salaam was a leading member of the FNM at age eighteen is based entirely on an unsupported assumption. The BIA seems to believe that "important" organizations do not have young leaders. Salaam was very clear in both his application and testimony that he was vice-president only of his district group consisting of 65 members. He was the sole spokesperson at the meetings because the purpose of the meetings was to disseminate information contained in the fliers *he wrote*. In addition to Salaam's testimony, two witnesses corroborated Salaam's explanation of his role in the FNM. Olufemi Samuel, a fellow political activist, stated that the average age of participants at some political meetings was between sixteen and eighteen. Samuel stated that Salaam was particularly vocal for such a young man. Salaam's older brother also confirmed that Salaam has been vocal and aggressive since he was a young child. Given the uncontradicted evidence in the record, the BIA's conclusion that Salaam's testimony was implausible cannot be sustained.

The BIA's only other reason for questioning the truthfulness of Salaam's claim was the "implausibility" of Salaam's testimony that he continued to include his name on fliers critical of the government after being arrested and beaten for writing the fliers. Again, the BIA's finding is an unsupported assumption in the face of sig-

nificant evidence. Salaam explained that he continued to include his name on the fliers because he wanted people to know where to send evidence of further government abuses. Salaam and his two witnesses testified to the young man's intense commitment to fighting government oppression in Nigeria. Salaam chastised his friend Samuel for abandoning the cause and stated that he would die for his country. The BIA offers no support for its conclusion that a "vocal" and "aggressive" young man such as Salaam would abandon his efforts to combat what he regarded as injustice after being arrested and tortured. It is not implausible that a motivated activist would continue to support his political ideals even in the face of repeated oppression.

Because the BIA's credibility determination "rested on insufficient and impermissible grounds ... we deem [Salaam's] testimony credible." *Akinmade*, 196 F.3d at 957–58. *See also Shah v. INS*, 220 F.3d 1062, 1072 (9th Cir.2000).

## B. Failure to Corroborate

The BIA also denied Salaam's asylum application because he failed to produce evidence of his membership in the FNM, his fliers, or medical records. The BIA found that these documents "should have been available" and that Salaam failed to provide a reasonable explanation for their absence.

■ This circuit's rule regarding corroboration is that: "[W]hen an alien credibly testifies to certain facts, those facts are deemed true, and the question remaining to be answered becomes whether these facts, and their reasonable inferences, satisfy the elements of the claim for relief. No further corroboration is required." *Ladha v. INS*, 215 F.3d 889, 900 (9th Cir.2000). We recently held that "where the IJ has reason to question the applicant's credibility, and the applicant fails to produce non-duplicative, material, easily available corroborating evidence and provides no credible explanation for such fail-

ure, an adverse credibility finding will withstand appellate review." *Sidhu v. INS*, 220 F.3d 1085, 1092 (9th Cir.2000). However, where, as here, the BIA offers no legitimate reason to question the applicant's credibility, we must reverse a finding that the applicant failed to meet his burden of proof because he did not provide corroborating evidence. We therefore deem Salaam credible and consider whether his experiences satisfy the elements of a claim for asylum and withholding of removal.

■ It is worth noting, however, that the BIA's finding that Salaam failed to produce available corroborating evidence is erroneous. The record does not contain substantial evidence that the specific corroborating documents mentioned in the BIA opinion were "easily available" to Salaam. *Shah*, 220 F.3d at 1070 (quoting *Sidhu*, 220 F.3d at 1091). Salaam provided a reasonable explanation for the absence of the documents: in his haste to flee the country, Salaam was able to gather only a few items from among his scattered belongings. Salaam also explained that it would have been dangerous for him to carry fliers critical of the government during his escape. Finally, Salaam did produce substantial evidence corroborating his claim. The record contains two reports describing conditions in Nigeria and a document explaining the mission of the FNM. *Cf. Akinmade*, 196 F.3d at 957 ("[P]etitioner's account was more than adequately corroborated by the general descriptions of the political situation in Nigeria contained in the U.S. Department of State Report and Amnesty International publications."). Two witnesses (neither of whom was found incredible) testified that Salaam was a member of the FNM, a precocious leader, an aggressive speaker, and a dedicated member of the Nigerian opposition. Salaam showed the IJ scars received from beatings at the hands of the Nigerian police.

We reverse the BIA's finding that Salaam did not adequately corroborate his testimony and hold that in any event corroboration was not required because the reasons given for questioning Salaam's credibility were without merit.

### C. Eligibility for Asylum

■ Salaam has proven by compelling evidence that he suffered past persecution on account of his political opinion. *See Navas v. INS*, 217 F.3d 646, 655–56 (9th Cir.2000) ("In order to establish eligibility for asylum on the basis of past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' [political opinion]; and (3) is committed by the government . . ."). The BIA gave no reasons, other than the implausibility of Salaam's story and his failure to provide corroborating evidence, for denying Salaam's request for asylum and withholding of deportation. Found credible, Salaam's evidence of past persecution on the basis of political opinion is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *see also Akinmade*, 196 F.3d at 958. On four occasions the Nigerian police arrested Salaam, held him incommunicado for several days, and tortured him because he wrote and distributed fliers critical of the government. Salaam's account of these events in his very detailed testimony and application for asylum is uncontroverted.

Because Salaam has established past persecution on account of political opinion, he is entitled to a presumption that he has a well-founded fear of future persecution. *See* 8 CFR § 208.13(b)(1)(i). The INS bears the burden to demonstrate by a preponderance of the evidence that country conditions have changed sufficiently to rebut that presumption. *See id.*

■ The record before us contains no evidence that country conditions in Nigeria have changed at all, let alone changed sufficiently to rebut the perception that Salaam has a well-founded fear of future persecution. "Where, as here, we conclude that past persecution has been established, but the INS has failed to introduce the requisite country conditions information and thus has failed to meet its evidentiary burden on that issue, we do not remand, because the ultimate outcome is clear." *Navas*, 217 F.3d at 662.

On the record before the BIA, Salaam was statutorily eligible for asylum.

### D. Withholding of Removal

■ The finding of past persecution also triggers a presumption that Salaam has shown a clear probability of future persecution and is therefore entitled to withholding of removal. *See id.* Again, there is nothing in the record to rebut that presumption.

Petition for review GRANTED; REMANDED for the exercise of the Attorney General's discretion with respect to the asylum claim and for entry of an order withholding removal.